## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| A.O.H., an individual, | Case No. _____ |
| Plaintiff, | **JUDGE ALGENON L. MARBLEY** |
| v. | **DEMAND FOR JURY TRIAL** |
| RED ROOF INNS, INC., and RED ROOF FRANCHISING, LLC., | |
| Defendants. | |

## <u>COMPLAINT</u>

COMES NOW, the Plaintiff A.O.H. ("Plaintiff" or "A.O.H.."), by and through her undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

## <u>INTRODUCTION</u>

1.      Plaintiff is a survivor of human sex trafficking.

2.      Plaintiff met her traffickers through a friend. Ultimately her traffickers came to control every aspect of her life. The defining factor of the relationship between Plaintiff and her traffickers, was that each night, Plaintiff's traffickers forced her to have sex with men for money, including the employees of the Red Roof Inn where she was trafficked.

1

3.     Plaintiff was trafficked in hotels owned by Defendants[1] Red Roof Inns, Inc. ("RRI") and Red Roof Franchising, LLC("RRF") (together, "Red Roof").[2] Plaintiff's traffickers rented hotel rooms for one purpose—a location to engage in sex trafficking.

4.     Plaintiff's traffickers bragged that they would never get caught because of their relationship with the employees at the hotel, who would look the other way when the buyers came every hour to rape Plaintiff in exchange for money and/or drugs and/or sex with A.O.H.

5.     Plaintiff's traffickers would make up many different stories as to why they had no identification to put on file and would pay the front desk employees more money so they could rent the room without identification.

6.     Plaintiff's traffickers would offer 20 minutes with A.O.H. in exchange for the room rental.

7.     Plaintiff's traffickers would get two rooms, and they stayed in one and forced A.O.H. to sell her body for sex from the other room.

8.     Plaintiff's traffickers forced her onto Red Roof's property where she was repeatedly raped and forced to perform commercial sex acts with "buyers" under threats of physical and psychological abuse.

9.     One day when the trafficker left to get food, Plaintiff was able to escape the prison of Red Roof's hotel rooms. She ran and did not look back.

10.    Plaintiff has spent a considerable amount of time attempting to regain the life that

---

[1] Throughout this Complaint, when Plaintiff refers to "Defendants," that statement is alleged as to all Defendants named in this action, including Red Roof Inns, Inc., and Red Roof Franchising, LLC. In the instances when Plaintiff alleges a fact as to only one Defendant, or some number of Defendants less than the total, the Complaint clearly names the Defendant to which the allegation is made.

[2] Defendants Red Roof Inns, Inc. ("RRI") and Red Roof Franchising, LLC ("RRF") will be collectively referred to as "Red Roof."

was stripped away from her as a result of her trafficking.

11.     Plaintiff brings this lawsuit in an attempt to hold Red Roof accountable for their role in her trafficking.

## OVERVIEW OF TRAFFICKING

12.     For decades, sex traffickers have brazenly operated in and out of hotels throughout this country. Traffickers paraded throughout hotels, while hospitality giants stood on the sidelines and did nothing. Instead, hotels and motels paid only lip service to campaigns against sex trafficking and stood by collecting millions in profits from their trafficking occurring on their properties.

13.     The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[3] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

14.     The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Red Roof understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Red Roof knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[4]

15.     Red Roof knew and have known for decades that they profit from sex trafficking

---

[3] See, e.g., A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; Prostitution and Trafficking in Women: An Intimate Relationship, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women intimate-relationship.
[4] *Id.*

repeatedly occurring under their brand flags. Rather than taking timely and effective measures to stop profiting from this epidemic, Red Roof chose to ignore the open and obvious presence of sex trafficking on their branded properties, benefitting from the profit and fees created by rooms rented and Wi-Fi provided for this explicit and apparent purpose.

16.     The sex trafficking industry alone pulls in an estimated $99 billion each year, making it the second largest illicit trade after the sale of all illegal drugs.[5] However, traffickers aren't the only profiteers. The hotel industry, including Red Roof, makes millions from participating in ventures that they know or should have known engage in violations of 18 U.S.C. § 1591(a) through renting rooms where sex trafficking victims are harbored night after night and providing Wi-Fi that traffickers use to advertise and solicit victims for commercial sex acts. Red Roof and traffickers have a mutually beneficial relationship, fueled by the sexual exploitation of victims.

17.     The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Red Roof knew or should have known regarding the trafficking of Plaintiff at Red Roof 's Hotel.

18.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[6] This is no accident. For years, sex traffickers have been able to reap enormous profits with "little risk when attempting to operate within hotels."[7] In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[8]

---

[5] *Profits and Poverty: The Economics of Forced Labor,* INTERNATIONAL LABOR ORGANIZATION (2017), https://www.ilo.org/global/topics/forced-labour/statistics/lang--en/index.htm.

[6] "This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-traffickingusslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere."

[7] See Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

[8] Michele Sarkisian, Adopting the Code: Human Trafficking and the Hospitality Industry, CORNELL HOSPITALITY

Hotels have been found to account for over 90 percent of commercial exploitation of children.[9]

19.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Red Roof, on best practices for identifying and responding to sex trafficking.[10]

20.     Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[11]

21.     Widely recognized signs of sex trafficking, which can be observed by hotel staff all which Red Roof was made of aware of, include but are not limited to:

  a. Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

  b. Individuals show signs of physical abuse, restraint, and/or confinement;

  c. Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

---

REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wpcontent/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[9] Erika R. George & Scarlet R. Smith, In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

[10] See, e.g., Department of Homeland Security, Blue Campaign Toolkit, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, Child Sex Trafficking Overview, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, Red Flags for Hotel and Motel Employees, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

[11] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023); National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, Red Flags for Hotel & Motel Employees, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, Human Trafficking Red Flags, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).

d.   Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

e.   Individuals lack freedom of movement or are constantly monitored;

f.   Individuals avoid eye contact and interaction with others;

g.   Individuals have no control or possession of money or ID;

h.   Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

i.   Individuals have few or no personal items – such as no luggage or other bags;

j.   Individuals appear to be with significantly older "boyfriend" or in the company of older males;

k.   A group of girls appear to be traveling with an older female or male;

l.   A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

m.   Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

n.   Possession of bulk sexual paraphernalia such as condoms or lubricant;

o.   Possession or use of multiple cell phones; and

p.   Possession or usage of large amounts of cash or pre-paid cards.[12]

22.     The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Tool kits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[13] From check-in to check-out, there are indicators that traffickers and their victims

_____

[12] *Id.*
[13] Department of Homeland Security, Blue Campaign Toolkit,

exhibit during their stay at the hotel.

23.     Red Roof and other members of the hospitality industry are and have long been aware of the prevalence of human trafficking, particularly sex trafficking, at hotels in general and at the Red Roof's own properties. Red Roof and others in the industry have access to much public information on the prevalence of human trafficking at hotels, including reports by, among others, the Polaris Project created for the use of the hospitality industry.

24.     The hospitality industry, speaking through industry organizations, has in recent years been increasingly vocal about its supposed "unified commitment" to combat human trafficking. Unfortunately, the near-total lack of concrete action by Red Roof and the rest of the hospitality industry shows that the industry in fact has a "unified commitment" to the very opposite: continuing with business as usual, so that Red Roof and all industry participants continue to profit millions from participating in a venture in violation of § 1591(a).

25.     Red Roof's decision to prioritize profits over protecting sex trafficking victims resulted in the repeated sexual exploitation and rape of Plaintiff on its properties.

26.     Plaintiff, a survivor of sex trafficking. Key findings from the Polaris Project are that "[s]urvivors of human trafficking are not thriving. The systems that were supposed to protect them before, during and after their human trafficking situations failed and failed miserably. Systems such as child welfare, criminal justice and legal systems — failed." https://polarisproject.org/national-survivor-study/

27.     Plaintiff looks to the judicial system, who has been empowered by Congress to provide a remedy to Victim-Survivors pursuant to the Trafficking Victim Protection Reauthorization Act, 18 U.S.C. § 1595. Red Roof, knowingly benefitted from participation in a

---

https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

venture that it knew or should have known to be engaging in violations of 18 U.S.C. § 1591(a).

## PARTIES

28.     Plaintiff is a natural person and a resident and citizen of South Bend, Indiana.

29.     Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16).

a.  Due to the sensitive and intimate nature of the issues, Plaintiff requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Defendants maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after.[14]

b.  Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[15] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[16] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense.[17]

c.  Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information,

---

[14] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[15] Fed. R. Civ. P. 10(a).

[16] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[17] Fed. R. Civ. P. 26(c).

including rape. Plaintiff fears the stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

d.  Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[18]

e.  Moreover, Red Roof will not be prejudiced. Plaintiff will agree to reveal her identity to Red Roof for the limited purpose of investigating Plaintiff's claims once the parties have entered a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Red Roof will not use or publish Plaintiff's identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

30.  **Defendant Red Roof Inns, Inc ("RRI").** is a publicly traded company. The company provides franchise opportunities for its hotel and motel brands through **Defendant Red Roof Franchising, LLC ("RRF") (together "Red Roof")**.[19] Red Roof purchases, owns, and manages a network of hotels and motels globally, primarily in the Midwest, Southern, and Eastern United States. Red Roof serves customers throughout the United States and other countries throughout the World.

31.  RRI is a global hotel brand with approximately 650 branded properties worldwide. It is a Delaware corporation, with its corporate headquarters and principal place of business at

---

[18] *Does I thru XXIII, 214 F.3d* at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

[19] Upon information and belief, Red Roof Franchising, LLC is a wholly owned subsidiary of Red Roof Inns, Inc. and serves as Red Roof Inns, Inc.'s franchising arm.

7815 Walton Pkwy, New Albany, Ohio 43054.

32.     RRI maintains a registered agent in Ohio, and it can be served through its registered agent, Corporation Service Company, at 1160 Dublin Road, Suite 400, Columbus, Ohio 43215.

33.     RRF was named one of the fastest growing franchises in 2017. It is a Delaware limited liability company with its corporate headquarters and principal place of business at 7815 Walton Pkwy, New Albany, Ohio 43054.

34.     RRF maintains a registered agent in Ohio, and it can be served through its registered agent, Corporation Service Company, at 1160 Dublin Road, Suite 400, Columbus, Ohio 43215.

35.     RRF and RRI participated in a joint venture operating the Red Roof Inn located at 8730 Artesia Blvd, Bellflower, CA 90706, ("Bellflower Red Roof Inn") from a central location at the RRI corporate offices in New Albany, Ohio, within this district. On information and belief:

    a.  The relationship between RRF and RRI was centered at the RRI corporate offices in the Southern District of Ohio.

    b.  RRF and RRI signed agreements with one another related to Bellflower Red Roof Inn from RRI corporate offices in the Southern District of Ohio.

    c.  RRF and RRI exercised joint control over operations of Bellflower Red Roof Inn from a central location at RRI corporate offices in the Southern District of Ohio.

    d.  RRF and RRI distributed revenue earned from Bellflower Red Roof Inn among themselves from RRI corporate offices in the Southern District of Ohio.

    e.  RRF and RRI developed policies for Bellflower Red Roof Inn from RRI corporate offices in the Southern District of Ohio.

    f.  RRF and RRI communicated with one another regarding operation of Bellflower Red Roof Inn from RRI corporate offices in the Southern District of Ohio.

36.     Plaintiff's claims arise out of Red Roof's actual and apparent agency relationship with its branded hotels, including the Bellflower Red Roof Inn where Plaintiff was trafficked. Red Roof is liable, directly, vicariously, and indirectly through an agency relationship for the acts and/or omissions of the employees at its branded hotels, including the Bellflower Red Roof Inn. Red Roof's participation in a venture with its branded properties, including Bellflower Red Roof Inn, occurred, in substantial part, in Ohio because:

a.  Upon information and belief, Red Roof's branded properties actively sought out a franchising relationship by contacting Red Roof in Ohio.

b.  Red Roof branded properties acknowledged that the execution and acceptance of the franchising agreement occurred in the Southern District of Ohio.

c.  The franchising agreement had a choice of law provision selecting the law of Ohio as the governing law.

d.  The franchising agreement required Red Roof branded properties to irrevocably submit to the jurisdiction of Ohio courts and waived all objections to personal jurisdiction and service of process.

e.  The franchising agreement required Red Roof branded properties to report information to the Defendant Red Roof in Ohio, including information about all incidents involving safety, security, public relations, or serious injury to persons or property that occur at, or involve, the subject motel, including those involving sex trafficking victims.

f.  Red Roof branded properties agreed to submit all notices required under the franchising agreement to Defendant Red Roof in the Southern District of Ohio.

g.  Red Roof branded properties was required to attend training and meetings in

Ohio.

h. Defendants Red Roof dictated policies related to safety, security, human trafficking, employee training and response as well as other subjects from their principal place of business in the Southern District of Ohio.

i. Red Roof branded properties had an ongoing obligation to participate in centralized programs operated by Defendant Red Roof from their principal place of business in the Southern District of Ohio.

j. Upon information and belief, reservation information for rooms at the subject motel passed through a system operated and managed by the Defendant Red Roof from their principal place of business in Ohio.

k. Upon information and belief, payment information for rooms at the subject motel passed through a system operated and managed by Defendant Red Roof in Ohio.

l. The benefit that Red Roof branded properties received from room rentals was governed by the Ohio franchising agreement.

m. Red Roof branded properties agreed to make all payments due under the franchising agreement at Defendants Red Roof principal place of business in the Southern District of Ohio.

n. Red Roof's branded property's operation of the Bellflower Red Roof Inn was controlled and/or influenced by many policies set and enforced by Defendants Red Roof from their principal place of business in Ohio. Including those policies specifically related to prostitution, commercial sex, human and sex trafficking.

37. Furthermore, Red Roof benefited from its operations at the Bellflower Red Roof Inn in more ways than just through royalty payments, licensing fees, and room revenue. Upon

information and belief, Red Roof gathered personal data from the Wi-Fi services it provided to guests, including both Plaintiff and her trafficker. This data collection provided further value to Red Roof, enhancing its ability to market and promote its services while maintaining and promoting a positive public image for its brand.

38.     Whenever reference is made in this Complaint to any act, deed, or conduct of Red Roof, the allegation is that Red Roof engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Bellflower Red Roof Inn, where Plaintiff was trafficked.

## JURISDICTION AND VENUE

39.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

40.     The Court has personal jurisdiction pursuant to the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA").

41.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because the Court has personal jurisdiction over RRI, and RRF.

42.     Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants Red Roof Inns, Inc. and Red Roof Franchising, LLC have their principal place of business within this District.

## FACTUAL BACKGROUND

### INTRODUCTION

43.     Plaintiff brings her claims against a major hotel brand corporation for violations of the TVPRA.

44.    The TVPRA prohibits Defendants from profiting from any venture they know or should know involves a violation of § 1591 and thereby establishes a non-delegable duty of reasonable care.

45.    An overwhelming majority of commercial sex trafficking transactions occur within the hotels and motels, as traffickers use their rooms as the hub for their operations.[20] Hotels offer anonymity and non-traceability, privacy, and discretion, making them ideal venues sex trafficking. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex. In addition, traffickers regularly use Red Roof's Wi-Fi to advertise and solicit victims for commercial sex against their will.

46.    As part of their conspiracy, to save costs and continually reap millions of dollars in profits, Red Roof generally failed to create, adopt, implement, and enforce company-wide policies and procedures regarding suspected incidents of human trafficking at the branded properties— despite the general knowledge in the industry and their own corporate records that human sex trafficking was happening in the hotel industry and in their branded properties. Furthermore, Red Roof, did not train staff how to identify and respond to suspected human trafficking, failed to require training of all employees on human trafficking policies and procedures, and failed to conduct audits confirming compliance with policies and procedures.

47.    Even though it had the ability to and did monitor suspected or incidences of criminal activity Red Roof kept no reports or data on suspected incidences or occurrences of human trafficking on their properties and the rate at which those occurrences changed as a result of implementing human trafficking policies and procedures. Red Roof did not establish mandatory and secure reporting mechanisms at the point of sale.

---

[20] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, HUFFINGTON POST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_ 7840754.

48.     Despite the proven ability to respond to important societal issues such as COVID-19 by modifying the brand standards to keep guests safe, Red Roof did nothing in the face of the human sex trafficking epidemic in their industry.  Instead, they continued to profit from the rental of rooms that they knew or should have known were rented and used for the purpose of sex trafficking.

49.     Red Roof thus failed to act to ensure that it did not benefit from the human sex trafficking occurring at its branded properties. Red Roof failed to implement appropriate policies and procedures that a reasonably diligent corporation would or should have implemented so that it would not continue to benefit from the human trafficking occurring at their branded properties.

50.     With little to no risk posed to traffickers seeking to use Red Roof's rooms as a location to force victims like Plaintiff to engage in commercial sex against her will, the sex trade continues to thrive at Red Roof's branded properties while Red Roof reap the benefits.

51.     Plaintiff's injuries are indivisible and cannot be separated. Plaintiff's injuries are the result of continued instances of ongoing violent traumatizing sexual exploitation.

52.     Plaintiff's injuries are almost exclusively mental, emotional, and psychological in nature and derive from the trafficking period.  A trafficking period is ongoing and continuous and resulting injuries cannot be divided; thereby subjecting Red Roof to joint and several liability. Federal common law provides for joint and several liability for indivisible injuries, such as those suffered by Plaintiff

53.     Plaintiff's injuries—particularly Plaintiff's ongoing mental, emotional, and psychological injuries—have no reasonable basis on which to determine the relative contribution of a particular defendant conduct to the single harm.

54.     Violators of Section 1595 of the TVPRA are jointly and severally liable for a

victim's damages. Victims are entitled to all compensatory and non-compensatory damages incurred during their trafficking period. 18 U.S.C. §1595(a). Thus, Red Roof is jointly and severally liable for Plaintiff's damages in this case.

## THE SEX TRAFFICKING OF PLAINTIFF

55.     Plaintiff met her traffickers when she was twenty-nine (29) years old.

56.     By means of a combination of force, coercion, violence, threats, manipulation, compelled use of and dependency on illegal substances, control over identification documents and possessions, and deprivation of basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing, Plaintiff was held captive and sold for sex by her traffickers.

57.     During the time that she was trafficked, Plaintiff's traffickers frequently rented rooms at Red Roof 's Bellflower Red Roof Inn because the rooms provided convenient, anonymous, and relatively central locations for "johns" that would pay to engage in sex with Plaintiff.

58.     Throughout her trafficking, Plaintiff's traffickers connected with "johns" by posting or causing to be posted advertisements on Backpage advertising for Plaintiff's availability for commercial sex. Plaintiff's traffickers posted many of these advertisements and had conversations with "johns" while connected to Red Roof's Wi-Fi.

59.     Plaintiff was forced to have sex with multiple "johns" every day she was trafficked in Red Roof's Bellflower Red Roof Inn.

60.     In 2015, while under the coercive control of traffickers, Plaintiff's was imprisoned in hotel rooms rented by her traffickers and forced her to have sex for money. During that time, Plaintiff was trafficked at the following hotel:

      a.   Bellflower Red Roof Inn.

61.     While at Red Roof's hotel, Plaintiff's traffickers violently attacked and beat her, and psychologically tormented her by withholding food and water, all to ensure that she could not escape.

62.     During her captivity at Red Roof's hotel, Plaintiff was raped, continuously abused physically and verbally, malnourished, psychologically tormented, kidnapped, and imprisoned in Red Roof's hotel.

63.     At Red Roof 's hotel, Plaintiff encountered the same staff on multiple occasions. Red Roof's staff would have seen the signs of Plaintiff's deterioration brought on by the abuse perpetrated by her traffickers, including bruising and physical and verbal abuse occurring in public areas of Red Roof's property as well as signs of malnutrition and poor health.

64.     Every time Plaintiff interacted with Red Roof's staff, it was readily apparent that Plaintiff was under the control of her traffickers. Plaintiff's traffickers, who were significantly older than Plaintiff, checked in to Red Roof's hotels using their own names.

65.     Plaintiff's traffickers followed a repetitive and routine procedure during stays at the Red Roof's hotel which constituted a continuous business relationship, and Red Roof 's hotel knew or should have known of Plaintiff's trafficking because of a variety of factors detailed below:

**THE SEX TRAFFICKING OF A.O.H. AT THE BELLFLOWER RED ROOF INN**

66.     Plaintiff was subjected to sex trafficking at the Red Roof branded Bellflower Red Roof Inn.

67.     Plaintiff and her traffickers stayed at the Bellflower Red Roof Inn in 2015, frequently staying for weeks at a time, encountering the same staff, within this period.

68.     Hotel staff at Bellflower Red Roof Inn always placed Plaintiff and her traffickers in a room away from other guests.

69.     On more than one occasion, Plaintiff's traffickers physically abused Plaintiff in public spaces in the Bellflower Red Roof Inn.

70.     Bellflower Red Roof Inn staff even paid Plaintiff's traffickers for drugs.

71.     Plaintiff's pain and suffering at the Bellflower Red Roof Inn was ongoing, as loud sounds of abuse and Plaintiff's screams for help could often be heard from the room.

72.     Further, Plaintiff's stays at the Bellflower Red Roof Inn by Red Roof, resulted in several consistent red flags, including, but not limited to: Paying for stays in cash; Requesting a room away from other guests; Obvious signs of illegal drug use; Frequent requests for linen changes; Unusually large number of used condoms in the trash; Physical abuse in public spaces; Visible signs of prior and private physical abuse; Unusually large number of male visitors coming in and out of the room; Asking the front desk not to be disturbed; Women wearing clothing inappropriate for the weather; Loud noises of abuse or other emergency audible to staff or other rooms; and Loitering and soliciting on hotel grounds.

73.     Plaintiff was repeatedly raped and otherwise sexually abused many times at the Bellflower Red Roof Inn.

74.     These red flags were open and obvious to anyone working at the Bellflower Red Roof Inn.

**DEFENDANTS' KNOWLEDGE OF SEX TRAFFICKING AT THEIR LOCATIONS**

75.     Red Roof is aware that the hospitality industry is a major life source of the human trafficking epidemic both in the U.S. and abroad.[21] The United Nations,[22] international non-

---

[21]Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[22] *Global Report on Trafficking in Persons,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (2020), 84 8available at https://www.unodc.org/documents/data-and-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf; See also *We must act together to fight exploitation and human trafficking in tourism, say United Nations and international partners,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (April 24, 2012) available at

profits,[23] and the U.S. Department of Homeland Security,[24] have documented this well-known epidemic of human trafficking for years and brought particular attention to the indispensable role of hotels. Red Roof cannot help but be aware of the public outcry against human trafficking, especially when so much of the uproar surrounds their industry.

76. For example, in 2004 End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States, identifying the steps companies would need to take to prevent child sex trafficking. ECPAT-USA identified hotel-specific best practices for preventing sex trafficking, such as: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number.

77. Further, nationwide campaigns have recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign[25] and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[26] These efforts sought to educate both the

---

https://www.unodc.org/unodc/en/press/releases/2012/April/we-must-act-together-to-fight-exploitation-and-human-trafficking-in-tourism-say-united-nations-and-international-partners.html

[23] The Polaris Project and ECPAT-International have published extensive reports and professional toolkits on human trafficking in the hospitality industry for years.

[24] Human Trafficking and the Hospitality Industry, U.S. DEPARTMENT OF HOMELAND SECURITY (2020), available at https://www.dhs.gov/blue-campaign/hospitalityindustry; Hospitality Toolkit, U.S. DEPARTMENT OF HOMELAND SECURITY (2016), available at https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

[25] *The Blue Heart Campaign,* UNITED NATIONS (2022), https://www.unodc.org/blueheart/#:~:text=The%20Blue%20Heart%20Campaign,help%20prevent%20this%20heinous%20crime.

[26] *DHS Blue Campaign Five Year Milestone*, DEP'T OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released free online resources and toolkits publicly accessible to any entity concerned with human trafficking.

78.     Red Roof, on information and belief, have access to individual hotel location do-not-rent lists that often list reasons for the refusal to rent, including the suspicion of human trafficking.  Red Roof nevertheless did not share such information with other hotel locations, thereby preventing other of their hotel locations from acting to protect the victims of such suspected human traffickers.

79.     Red Roof also has access to public police reports, news reports and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations in particular.

80.     Red Roof has access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

81.     A brief examination of just a handful of examples for Red Roof suffices to show the extraordinary frequency with which Red Roof has long received and continue receiving evidence and reports that human trafficking runs rampant at their hotel locations:

**RED ROOF**

82.     Red Roof knew commonly occurring signs of illegal activity associated with sex trafficking. For example, no later than 2010 Red Roof advised hotel management that staff should constantly be on the lookout for unusual or irregular activity on the property, including multiple guests arriving/leaving a guestroom for short durations of time or a pimp or partner who sits in the

20

lobby or a vehicle while online setting up prostitution appointments for a property. The policy also identified signs that housekeeping staff should look for when entering guest rooms, which were consistent with the recognized "red flags" of trafficking in the hotel industry.

83.     Red Roof knew and communicated to franchises and hotel management that trafficking was often associated with other criminal activity, including drugs and assaults.

84.     Countless tales of tragedy, which upon information and belief Red Roof Inn knew about, establish the entrenched and pervasive nature of Red Roof's role in providing a venue where sex trafficking has continued, unabated, for years. For example, reviews of its branded properties, which upon information and belief Red Roof monitors regularly, also show the pervasiveness of sex trafficking at its branded properties and Red Roof Inn's knowledge of the same.

85.     Furthermore, the Woburn, Massachusetts Daily Times reported as early as February 2000 that its Red Roof Inn was facing closure by the city licensing commission as a result of pervasive criminal activity, prostitution and sex trafficking.[27] Such criminal conduct continued unabated until at least 2012, when Vice President of Operations for Red Roof Inn, Joesph Maddux was forced to appear before the Licensing Commission. Responding to reports of dangerous men using prostitutes as young as fourteen (14) at the Woburn Red Roof Inn and 118 police reports from 2011 alone, Maddux assured the Licensing Commission that Red Roof Inn's President and legal department had been updated and outlined some of the steps the company was considering addressing criminal activity including prostitution at its branded properties.[28]

---

[27]     https://woburnpubliclibrary.org/wp-content/uploads/2019/03/Woburn-Daily-Times-1904-1980-Non-consecutive-1995-2014.pdf 1
[28] http://homenewshere.com/daily_times_chronicle/news/woburn/article_99cddca6-5983-11e1-8393-0019bb2963f4.html

a. Installation and prominent display of new security systems providing 24-hour monitoring;

b. Institution of nation-wide changes to its registration policies and the information obtained at check-in;

c. Increased physical security of the Red Roof Inn location;

d. Elimination of smoking floor(s); and

e. Hotel upgrades and price increases to price rooms beyond the criminal clientele.

86.     Sadly, there is no evidence that any such steps were taken in Woburn or across the country.  In July 2020, the Woburn License Commission again instituted action against the Red Roof Inn location following over 150 police incident reports including those for "human trafficking, prostitution and drugs…"[29]

87.     Information that has become public through news stories establishes the entrenched and pervasive nature of Red Roof's role in providing a venue where sex trafficking has continued unabated for years. Among notable press involving the frequent use of Red Roof Branded hotels for illegal activity, the following was noted:

a. In 2010, a man and woman appeared in court on charges of trafficking a 14-year-old Milwaukee girl at a Red Roof Inn in Oak Creek, Wisconsin. At the Red Roof Inn, the traffickers gave the girl marijuana to smoke and then took pictures of her naked, which were put on a local website.[30]

b. In 2010, 2 were charged with transporting a minor to engage in prostitution after a 17-year-old California runaway was trafficked at Red Roof Inn locations in New

---

[29] https://woburnma.gov/wp-content/uploads/2020/08/7-23-20-License-Commission-minutes.pdf
[30] John Diedrich, *2 face federal sex-trafficking charges*, Milwaukee Journal Sentinel (June 16, 2010), https://archive.jsonline.com/news/crime/96508359.html/

York and Maryland.[31]

c.  In 2012, a Pennsylvania man was indicted by a federal grand jury on charges of sex trafficking involving a 16-year-old girl who was trafficked at a New Jersey Red Roof Inn in May 2012.[21] In 2014 he was sentenced to 10 years in federal prison.[32]

d.  In 2012, A Minneapolis police officer investigating juvenile sex trafficking activity spotted an ad on the website Backpage.com that depicted the image of a provocatively dressed young woman offering "unrushed service, full of pleasure." The officer called the number on the ad and spoke with a female who said she was at the Red Roof Inn in Woodbury.[33]

e.  In 2012, a Rochester man and woman were charged in a sex trafficking case of a minor. Investigators determined that two customers paid to have sex with the victim and the woman arrested at the Red Roof Inn.[34]

f.  In 2012, two teenage girls were human trafficking victims at a RRI in Charlotte, North Carolina. In subsequent interviews with other human trafficking victims, they alleged their pimps would pay RRI managers and maids to not report illegal activities.[35] RRI eventually pulled its brand from the hotel.[36]

---

[31] https://www.washingtonexaminer.com/teen-prostituted-held-against-her-will-in-md-and-va-hotels-feds-say
[32] Michaelangelo Conte, *Man charged with sex trafficking a teen he met in Secaucus takes plea*, nj.com (Mar. 28, 2014), https://www.nj.com/hudson/2014/03/man_originally_charged_with_sex_trafficking_a_16-year-old_he_met_in_secaucus_takes_a_plea.html.
[33] Mike Longaecker, *Police: Sex trafficking victim turns up at Woodbury hotel*, Republican Eagle (August 17, 2012), https://www.republicaneagle.com/news/public_safety/police-sex-trafficking-victim-turns-up-at-woodbury-hotel/article_88eac778-73b4-50cb-ac65-182279d50948.html
[34] [24]Department of Justice, *ROCHESTER MAN AND WOMAN CHARGED IN SEX TRAFFICKING CASE* (Dec. 14, 2012), https://www.justice.gov/archive/usao/nyw/2012/TwoCharged.pdf

[35] FBI investigating teen human trafficking at Charlotte hotel, WBTV3 (Sept. 17, 2015), https://www.wbtv.com/story/30058536/fbi-investigating-teen-human-trafficking-at-charlotte-hotel/.
[36] *Id.*

g. In 2013, a 50-year-old man was charged with prostitution and human trafficking, for forcing a woman to perform sex acts against her will at the Red Roof Inn on Eisenhower Boulevard in Pennsylvania.[37]

h. In 2013, a local news station investigated a Florida Red Roof Inn because of the high volume of search warrants that continued to pop up for the hotel, including multiple warrants that reported a high volume of prostitution activity at the hotel.[38]

i. In 2013, A Lubbock grand jury indicted four suspects arrested during a prostitution sting. Police discovered two underage victims during their sting operation at the Red Roof Inn.[39]

j. The Knox County Sheriff's Office arrested a Knoxville man for human trafficking at a Red Roof Inn in 2013.[40]

k. In 2014, a Cincinnati man plead guilty in U.S District Court to locking up women in his Avondale home, then driving them to Red Roof Inn in Louisville where he forced them into prostitution.[41]

l. In 2014, a Rhode Island man pled guilty to attempted sex trafficking after he was accused of trying to procure customers to have sex with a 23-year-old woman in the Red Roof Inn on Wolf Road on Aug. 22, 2012.[42]

m. In 2014 a man was arrested by the FBI in Orlando for holding a 15-year-old girl in a Phoenix RRI and selling her for sex. He was later sentenced to 8 years in

---

[37] Brittany Miller, Man charged in prostitution ring headed to Dauphin County court, Penn Live Patriot News(October 9, 2013), https://www.pennlive.com/midstate/2013/10/post_625.html

[38] https://www.abcactionnews.com/news/motel-frequently-involved-in-criminal-activity-sees-more-than-200-calls-for-service-this-year

[39] 4 indicted on prostitution charges after Red Roof Inn sting, KCBD News 11 (August 28, 2013), https://www.kcbd.com/story/23272377/4-charged-with-prostitution-offenses-after-red-roof-inn-sting/

[40] https://www.endslaverytn.org/news/knoxville-man-faces-human-trafficking-charges-newsarticle

[41] https://www.fox19.com/story/27390036/avondale-man-pleads-guilty-to-sex-trafficking-in-louisville/.

[42] https://www.timesunion.com/local/article/Sex-traffic-case-ends-in-plea-5440052.php

prison.[43]

n. A Mississippi man was arrested in 2014 on human trafficking charges for trafficking a 16-year-old out of a Red Roof Inn in Madison County. He later pled guilty to human trafficking and was sentenced to 25 years in prison.[44]

o. In 2015, Police arrested 15 men in a sex-with-minors sting at a Red Roof Inn In Woodbury, Wisconsin.[45] The investigation started in 2014 when a man was arrested at the RRI after responding to a Craigslist ad for sex with a 32-year-old and fondling of her deaf daughter.[46]

p. In 2016, 2 were charged with human trafficking involving a minor following their arrest at a Red Roof Inn in Louisville, Kentucky.[47]

q. In 2016, 2 were charged in a human trafficking scheme after police arrested them at a Red Roof Inn in Jessup, Maryland.[48]

r. In 2016, 2 were arrested in New Jersey and accused of running an interstate human trafficking ring out of a Red Roof Inn in Lawrence.[49]

s. In 2016, a man was sentenced to ten years for trafficking a 15-year-old girl at two motels, including a Red Roof Inn in Enfield, Connecticut.[50]

t. In 2016, a man was sentenced for trafficking a minor at a Red Roof Inn in

---

[43] Jamee Lind, Phoenix man gets 8 years for selling teen for sex, The Republic (Mar. 30, 2015), https://www.azcentral.com/story/news/local/phoenix/2015/03/30/phoenix-man-sex-trafficking-sentence-abrk/70691190/.

[44] Mary Grace Eppes, Man sentenced for human trafficking in Madison Co., WLBT3 (Jan. 15, 2015), https://www.wlbt.com/story/27862158/man-sentenced-for-human-trafficking-in-madison-co/.

[45] Mathias Baden, UPDATE: Police arrest 15 men in sex-with-minors sting at Red Roof Inn, Republican Eagle (Sept. 23, 2015), https://www.republicaneagle.com/news/public_safety/update-police-arrest-15-men-in-sex-with-minors-sting-at-red-roof-inn/article_e48299f7-e13d-5c86-8e9f-f7faf22a8998.html.

[46] Id.

[47] https://www.wave3.com/story/31910401/2-charged-with-human-trafficking-involving-juvenile

[48] https://www.wbaltv.com/article/2-men-charged-in-howard-county-human-trafficking-scheme/7148473#

[49] https://www.trentonian.com/2016/09/01/new-york-man-accused-in-lawrence-sex-rings-boasts-about-600k-manhattan-home/

[50] https://www.courant.com/2016/11/14/hartford-man-sentenced-to-prison-for-sex-trafficking-of-15-year-old-girl/

Rochester, New York for an eight-month period in 2012.[51]

u. In 2016, two were arrested on human trafficking charges for forcing a woman into prostitution at an Indiana Red Roof Inn.[52]

v. In 2016, a man was sentenced on human trafficking charges after forcing a woman into prostitution at hotels, including a Red Roof Inn in Massachusetts.[53]

w. In 2016, arrests were made after investigation of a human trafficking operation operating out of hotels, including a Red Roof Inn in Illinois.[54]

x. In 2016, three were arrested on prostitution charges at a Red Roof Inn in Kentucky.[55]

y. In 2017, a man was charged with sex trafficking victims at a Red Roof Inn in Missouri.[56]

z. In 2017, there were six arrests following a prostitution bust at a Red Rood Inn in Ohio.[57]

aa. In 2017, a man pled guilty to sex trafficking a 14-year-old girl at a Red Roof Inn in Kentucky.[58]

bb. In 2017, twenty-three people were arrested in a human trafficking investigation

---

[51] https://www.democratandchronicle.com/story/news/2016/01/14/rochester-man-sentenced-sex-trafficking/78770804/
[52] https://www.jconline.com/story/news/crime/2016/12/29/court-docs-alleged-pimps-paid-victim-heroin/95952012/
[53] https://www.newburyportnews.com/news/man-gets-5-to-8-years-in-prison-for-human-trafficking/article_79f32b03-3e96-5360-af02-76c53e249dec.html
[54] https://www.shawlocal.com/2016/01/18/joliet-hotel-among-meeting-places-in-rappers-sex-trafficking-ring/alh59bo/
[55] https://www.wdrb.com/news/crime-reports/louisville-police-arrest-three-during-undercover-prostitution-investigation/article_12b5448c-2857-5b6b-ba04-0aba80d5b5da.html
[56] 46 https://www.stltoday.com/news/local/crime-and-courts/man-charged-with-sex-trafficking-at-red-roof-inn-in-st-louis/article_4c70ac45-ac34-5d28-bd3c-92efde095381.html
[57] https://www.news5cleveland.com/news/local-news/oh-summit/prostitution-bust-summit-co-investigators-fbi-arrest-six-at-springfield-township-red-roof-inn
[58] https://www.courier-journal.com/story/news/crime/2017/06/07/louisville-man-pleads-guilty-sex-trafficking-14-year-old/377971001/

for trafficking eight girls, between the ages of 14 and 17, at Stockton, California hotels, including the Red Roof Inn.[59]

cc. In 2017, two were arrested for sex trafficking children, including at a Red Roof Inn in Ohio.[60]

dd. In 2018, two men were indicted on charges of child sex trafficking after a 15-year- old girl was found at a Red Roof Inn in Delaware.[61]

ee. In 2018, two were charged for running a sex trafficking operation out of an Illinois Red Roof Inn.[62]

ff. In 2018, a Virginia court upheld a defendant's conviction for sex-trafficking offenses related out of trafficking that occurred at a Virginia Red Roof Inn.[63]

88. Ultimately, several hundred traffickers involved with hundreds of victims have been prosecuted by state and federal law enforcement agencies for sex trafficking and forced prostitution out of Red Roof Branded properties.

89. Upon information and belief, Red Roof monitored criminal activity occurring at Red Roof Branded hotels and thus was aware of these incidents and many similar incidents at Red Roof properties around the country.

90. Upon information and belief, upper-level executives of Red Roof monitored news stories and law-enforcement reports regarding criminal activity at Red Roof Branded hotels. Upon information and belief, the public relations department for Red Roof would circulate communications discussing criminal activity, including human trafficking and prostitution, at Red

---

[59] https://www.kcra.com/article/23-arrested-in-san-joaquin-county-human-trafficking/9588063
[60] https://www.cbs58.com/news/two-pastors-arrested-for-sex-trafficking-children
[61] https://www.acenewstoday.com/two-delaware-men-indicted-on-charges-of-child-sex-trafficking/
[62] https://www.wcia.com/news/local-news/two-people-face-charges-for-involvement-in-trafficking-ring/
[63] https://caselaw.findlaw.com/court/va-court-of-appeals/1944156.html

Roof Branded properties.

91.     No later than 2013, Red Roof began carefully monitoring online reviews and other customer feedback for Red Roof Branded properties. Indeed, top leadership of Red Roof was "obsessed" with review of customer feedback, including online reviews.[64]

92.     Leadership of Red Roof would receive compiled reviews from Reputology, an online review aggregator, that compiled reviews for Red Roof Inns all over the country, including the subject locations.[65] Red Roof responded to directly or required its employees to respond to reviews posted on review websites.

93.     This sampling of news stories, reviews, and other public information establishes that, at the time Plaintiff was trafficked at the Bellflower Red Roof Inn, Red Roof knew or should have known that:

    a.  There was widespread and ongoing sex trafficking occurring at Red Roof Branded properties.

    b.  Sex trafficking was a brand-wide problem for Red Roof originating from management level decisions at their corporate offices in Ohio.

    c.  Red Roof 's branded properties and hotel staff were not taking reasonable steps to identify and respond to known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties.

    d.  Red Roof 's efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective.

    e.  Red Roof and its branded properties were earning revenue by providing venues

---

[64] https://www.usatoday.com/story/travel/hotels/2013/04/05/red-roof-hotel-outlets/2056817/
[65] https://www.e-marketingassociates.com/blog/use-the-new-hootsuite-reputology-app-to-monitor-online-reviews

where widespread and ongoing sex trafficking was occurring.

94.     Despite the mounting evidence that sex trafficking at its properties was ongoing and growing, Red Roof continued to earn revenue by continuing conduct that they knew or should have known would facilitate that trafficking.

## **DEFENDANTS FACILITATED THE TRAFFICKING OF A.H.**

95.     Red Roof is a signatory of the Code[66] and thereby has promised to adopt these policies to combat trafficking. Yet, Red Roof has failed to implement most, if not all these policies, and continue to unlawfully benefit from the trafficking on their properties.

96.     Red Roof is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Red Roof publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Red Roof should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

97.     Red Roof profited from the sex trafficking of Plaintiff Red Roof rented rooms to and provided Wi-Fi to Plaintiff's traffickers when they knew, or should have known, that human trafficking was prevalent within their branded properties and at Bellflower Red Roof Inn where Plaintiff was trafficked. In addition to the active participation that Bellflower Red Roof Inn hotel staff had in Plaintiff's trafficking, by paying to have sex with Plaintiff, hotel staff, especially front desk staff, knew or should have known of the obvious signs of Plaintiff's trafficking.

98.     Red Roof benefited from the steady stream of income that Plaintiff's traffickers and "johns" bring to their hotel brands. Red Roof profited from each and every room that Plaintiff's traffickers and customers rented where Plaintiff was harbored and maintained for the purpose of

---

[66] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members

sex trafficking. In addition, Red Roof profited from data collected each and every time Plaintiff's traffickers and customers used Red Roof's Wi-Fi to advertise and solicit Plaintiff for commercial sex.

99.     Red Roof has made a public commitment to combat human trafficking, and thus, are aware that trafficking is a common problem in the hospitality industry. Red Roof should have been aware of the benefits they were receiving from the human trafficking occurring at the locations where Plaintiff was trafficked given Red Roof 's access to information, such as police reports, news articles, complaints, and negative reviews regarding Bellflower Red Roof Inn and surrounding areas.

100.    Moreover, Red Roof repeatedly collected data on Plaintiff, her traffickers, and her "johns" from her many stays at Red Roof's hotels, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data. Red Roof's employees witnessed the obvious signs of Plaintiff's trafficking including signs of abuse, frequent male visitors coming in and out of the room, condoms in the trash, loud yelling and fighting, and others. Despite having access to all this information for years, Red Roof failed to take reasonable measures to stop benefitting from sex trafficking occurring in their hotels. If Red Roof had taken proper measures, Red Roof would not have profited from Plaintiff and other victims like her being trafficked at their locations.

101.    Red Roof discussed, developed, and implemented uniform policies and procedures to identify, and mitigate the risk of human trafficking occurring at their properties, including the Bellflower Red Roof Inn where Plaintiff was trafficked. These policies included ongoing communication with its local hotels by including articles about human trafficking in newsletters, announcements at annual conferences, alerts to hotels in high-risk areas or in proximity to high-

risk events, and field-based associates who visit hotels specifically to discuss human and sex trafficking issues.

102.     Pursuant to these policies, branded location employees and property management regularly reported customer data and other indicators of trafficking including suspicious criminal activity, web data indicating use of commercial sex websites, and data associated with reservations. The staff at the Bellflower Red Roof Inn where Plaintiff was trafficked reported this to Red Roof or would have if Red Roof did not fail to institute reasonable policies and procedures.

103.     In addition, Red Roof had access to much of this data through the management of centralized data systems it required the branded properties to use, including but not limited to the property management, booking, credit processing, and information technology and internet systems.

104.     Red Roof failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to stop reaping the benefits of sexual exploitation on their properties. Red Roof maintained their deficiencies to maximize profits by:

   a.  Failing to mandate and minimizing costs of training employees and managers on how to spot the signs of human trafficking and sexual exploitation;

   b.  Lowering operating costs and management costs by failing to analyze the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the problems;

   c.  Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotels;

31

d.  Failing to refuse room rentals, or report guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

e.  Failing to monitor and track guest wireless network use for illicit commercial sex purposes or digital activity associated with human trafficking.

f.  Failing to institute proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation; and

g.  Failing to use its power as a parent company hold its branded properties accountable for contributing to the prevalence of sex trafficking on their properties.

105.    As a direct and proximate result of these egregious practices on the part of Red Roof, Plaintiff and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

**DEFENDANTS' CONTROL OVER THEIR BRAND HOTELS**

106.    Upon information and belief, it is a standard practice in the hospitality industry, followed by Red Roof, for Parent Hotel Corporations to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows that shall be placed on each bed, to the types of funds accepted, to when, where and how guests should be greeted.

107.    Red Roof provides their branded properties with signage on and in front of the building intended to assure customers that, if they check into that hotel, they can expect an experience consistent with the standards of the parent hotel brand. The same brand is emblazoned

32

on everything in the hotel, from the pens on the bedside table to the staff uniforms at the front desk.

108.     Red Roof provides branded properties brand name recognition, a marketing campaign, and hotel listings in the Global Distribution System and other online travel agency databases, as well as hotel locations with access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites. Thus, booking and room reservations are to a large extent controlled by Red Roof. Red Roof see booking and reservation trends, including for the Bellflower Red Roof Inn where Plaintiff was trafficked.[67]

109.     Upon information and belief, Red Roof requires its branded hotel properties to use a property management system, which is linked to Red Roof's corporate network and data center, for, among other things, receiving reservations, and processing credit card transactions.

110.     Upon information and belief, per the relevant franchise agreements,[68] Red Roof may enforce their brand standards by means of periodic inspections of their brand hotel locations, backed up with the ultimate threat of termination of the franchise agreement.

111.     Upon information and belief, Red Roof 's brand standards are so strict as to bar entirely certain efforts to combat trafficking, for instance by prohibiting the prominent placement of informational signs within hotel rooms offering to help victims escape.

112.     It is further a standard practice in the hospitality industry, upon information and belief, followed by Red Roof, for parent companies to exercise significant control over the employment decisions of their hotel locations.

---

[67] Where a branded hotel allows cash to be accepted for payment, monitoring and auditing these trends are important to identifying locations where criminal activity and commercial sex trafficking may be occurring.

[68] Most franchise disclosure documents, which outline the policies and procedures of franchise agreements, can be accessed publicly for free by making an account on https://fddexchange.com/view-fdd-docs.

113.     Red Roof and their hotel locations exhibit a significant degree of interrelated, intermingled, and unified operations at Bellflower Red Roof Inn where Plaintiff was trafficked. Upon information and belief, Red Roof promulgates policies, procedures, and standards governing the hiring, training, retention, and advancement of on-the-ground employees and setting their rates of pay, which together exert significant control over all employment decisions made at the Bellflower Red Roof Inn.

114.     On information and belief, Red Roof utilized some of these funds to monitor the brand standards and to offer training to hotel operators and franchisees.

115.     Under federal labor regulations, Red Roof is considered a joint employer of the employees at the Bellflower Red Roof Inn.

116.     As seen by citations herein to Red Roof 's website, shares or co-determine those matters governing the essential terms and conditions of employment Red Roof sets the essential terms and conditions of employment, including hiring, training, retention, advancement, and setting rates of pay.

117.     Specifically, Red Roof creates and promulgate policies relating to training employees to recognize and respond to human trafficking, and Red Roof determines whether such training shall be mandatory.

118.     Despite their knowledge that few, if any, employees at their hotel locations receive training if the same are not mandated, Red Roof has failed to mandate such training on any significant scale or at the Bellflower Red Roof Inn where Plaintiff was trafficked.

119.     On information and belief, Red Roof requires their hotel locations to pay approximately 10% of gross revenue back to Red Roof for the privilege of using Red Roof 's name and following their brand standards.

120. The stringent control and standardization of operations across Red Roof's branded properties, including mandatory use of specific reservation and payment systems, not only streamline corporate oversight but also optimize revenue streams. These systems, while ostensibly for operational efficiency, also facilitated the booking processes used by traffickers, thereby increasing room occupancy rates and directly benefiting Red Roof financially.

### RED ROOF

121. Red Roof exercises day-to-day control over the Bellflower Red Roof Inn and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Red Roof implements and retains brand hotel control, including control over the Bellflower Red Roof Inn, as either direct subsidiaries or under the terms of its franchise agreements.

122. Red Roof had the power to and did control the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

    a. Providing and requiring the use of the software, hardware, and platforms where data and information is shared with Red Roof corporate;

    b. Providing and requiring the use of the reservation platforms where payment modes and suspicious reservations would suggest trafficking;

    c. Providing and requiring training and education to branded hotels through webinars, seminars, conferences, and online portals;

    d. Providing and controlling customer review and response platforms;

    e. Hosting and requiring the use of online bookings on Red Roof's domain;

    f. Requiring branded hotels to use Red Roof's customer rewards program;

    g. Requiring branded hotels to use Red Roof's property management software;

h. Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

i. Providing IT support for all property management systems, owned, operated, and required by Red Roof;

j. Setting employee wages;

k. Sharing profits;

l. Standardizing training methods for employees;

m. Requiring building and maintaining the facility in a manner specified by the owner;

n. Requiring the use of the standardized or strict rules of operation;

o. Engaging in regular inspection of the facility and operation by owner; and

p. Fixing prices.[69]

123. Red Roof manages corporate training, policies, and procedures on human trafficking, cyber security, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Red Roof.[70]

124. Under the guise of maintaining its "brand standards," Red Roof forces its brand hotels to frequently undertake expensive renovations, remodeling, and construction efforts, as well as purchase mandated products with limited warranties which are shortened by such onerous and

---

[69] *See* 2021 Franchisee Disclosure Document, https://franchimp.com/?page=pdf&f=105990_2021.pdf

[70] *See e.g.*, *Brand Support*, RED ROOF, https://www.redrooffranchising.com/brand-support (last visited Jun. 9, 2022) ("We support our franchisees with extensive on-site training. On everything from helping with pricing strategy and operational expense management, to assistance with marketing and operation programs…Our cost-effective sourcing solutions, efficient technology support, and incredible property management system add even more value to your Red Roof franchise.")

exorbitant requirements.[71]

125. Red Roof's policies that mandate frequent renovations and adherence to strict brand standards, while costly for franchisees, result in higher room rates and an upscale brand image that attracts higher-paying clientele, including, regrettably, traffickers who prefer such discreet and reputable environments for their activities.

126. Red Roof did not merely identify quality or outcome standards. Instead, it specifically directed the means and methods that its branded properties and the staff at Bellflower Red Roof Inn should use for day-to-day operations and dictated many of the core tools that its branded properties were required to use to conduct those operations, including the means and methods of operations that directly caused Plaintiff's damages.

127. Upon information and belief, Red Roof had the right to and actually did enforce their control over their branded properties, including Bellflower Red Roof Inn, through the following methods:

q. Inspections of its branded properties, including Bellflower Red Roof Inn;

r. Monitoring its branded properties, including Bellflower Red Roof Inn, for compliance with policies and expectations;

s. Directing its branded properties, including Bellflower Red Roof Inn, to take specific steps to come into compliance with detailed and exacting standards;

t. Mandating training and education; and

u. Maintaining the right to terminate the franchise agreement.

139. Red Roof controls uniform and required reservation, marketing, and customer

---

[71] *See Design and Construction,* RED ROOF, https://www.redrooffranchising.com/design-and-constuction (last visited Jun. 9, 2022).

support systems and loyalty programs at its brand hotels, including the Bellflower Red Roof Inn.[72] Red Roof also advertises its brand hotels through national press releases, newsletters, emails, announcements on redroof.com, and mentions across its corporate media channels.[73]

128.    Red Roof requires its hotels to use a consolidated IT system and database for property management, credit processing and centralized billing, as well as problem-tracking to ensure all problems are resolved promptly and that emergencies are escalated.74

129.    Red Roof boasts of its "Streamlined Technology" and "Shared Success" with its brand hotels. To "make operations as easy and seamless as possible," Red Roof controls "a fully integrated database" which its brand hotels must use to access customer data and reservations, among other information shared system-wide between Red Roof and its brand hotels.75 Red Roof's privacy policy states that it collects information such as contact information, demographics, financial information, government-issued identification numbers, accommodation preferences, location, IP addresses, and social media content from hotel guests.76

130.    Red Roof also sets and controls Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at its brand hotels, including the

---

[72] *Id.*
[73] *Brand Marketing*, RED ROOF, https://www.redrooffranchising.com/brand-marketing (last visited Jun. 9, 2022) ("From your grand opening to being fully operational, our team helps you market your property every step of the way. We provide property-specific design services for print materials—like flyers and rack cards—and even help with billboards, transit advertising, and other local promotional needs.")
[74] *See* Red Roof Franchising, available at https://www.redrooffranchising.com/technology; *See also Sales Team,* RED ROOF, https://www.redrooffranchising.com/sales-team (last visited Jun. 9, 2022).
27 2022) (corporate Red Roof employees provide brand staff with "regional events, webinars, and in-person visits" alongside training, other support, and "RediBill® Brand-Wide Direct Billing" centralized billing program).
[75] *Technology*, RED ROOF, https://www.redrooffranchising.com/technology (last visited Jun. 9, 2022); see also *Privacy Policy*, RED ROOF, https://www.redroof.com/privacy-policy (last visited Jun. 9, 2022).
[76] *Id.*

Bellflower Red Roof Inn.[77]

131.     Through an integrated corporate marketplace, Red Roof mandates the use of specific vendors and suppliers for the purchase of goods and services at its brand hotels, including the Bellflower Red Roof Inn by Red Roof.[78]

132.     Additionally, Red Roof maintains comprehensive control over security and the reporting of criminal activities, including human trafficking, across its properties. Red Roof implemented a policy requiring staff at branded properties like the Bellflower Red Roof Inn to report potential criminal activities to corporate oversight. Upon information and belief, Red Roof implemented these safety and security measures by placing and monitoring security cameras, accepting and reviewing customer complaints, and inspecting Bellflower Red Roof Inn. It also collected data regarding hotel operations and customers, including names, payment information, reservation history, browsing data, and other details associated with their stay. Given Red Roof's retained control over security and criminal activity reporting, it had the responsibility and ability to monitor and address signs of illegal activities on its premises. Despite having the responsibility and the means to monitor and address these reports through various security measures such as camera surveillance and customer data analysis, Red Roof failed to act on clear indicators of trafficking. This neglect facilitated the sex trafficking of individuals including Plaintiff.

133.     On information and belief, Red Roof also retained control over property-specific data and customer data from Bellflower Red Roof Inn – which they obtained by controlling the means and methods by which Bellflower Red Roof Inn recorded, stored, and reported that data – such that they had actual or constructive knowledge – about the ongoing trafficking that was

---

[77] *See* sigmawifi Red Roof Inn Case Study, *available at* https://www.sigmawifi.com/red-roof-inn-nh-case-study/
[78] See *Operational Support Procurement Services*, RED ROOF, https://www.redrooffranchising. com/operational-support (last visited Jun. 6, 2022).

occurring at Bellflower Red Roof Inn during the time Plaintiff was trafficked there. Despite having access to detailed customer data, including guest names, payment information, and reservation history, Red Roof continued to facilitate trafficking at Bellflower Red Roof Inn by providing a venue – and associated services – where traffickers could profit from sexual exploitation with minimal risk of disruption.

134.    Furthermore, Red Roof maintained control over the safety and security of its branded properties by setting up systems for customers to report issues to Red Roof rather than its branded properties, including Bellflower Red Roof Inn. Despite doing this, Red Roof still failed to act reasonably in response to complaints about criminal activity and sex trafficking at its branded properties, including Bellflower Red Roof Inn.

135.    In addition, both Red Roof and its branded properties participated in the venture through the acts and omissions of the staff at Bellflower Red Roof Inn because Red Roof and its branded properties jointly employ or ratify the employment of staff at Bellflower Red Roof Inn.

136.    Red Roof posts job openings for its branded properties on its central career positing website.[79] Red Roof provides benefits to employees of its branded properties, and upon information and belief controls the terms and conditions of their employment by:[80]

   a.   Posting jobs for its branded properties;

   b.   Providing benefits to staff of its branded properties;

   c.   Setting pay, pay parameters, or pay ranges for staff of its branded properties;

   d.   Setting job qualifications;

   e.   Setting job descriptions;

   f.   Dictating staffing levels required at its branded properties;

---

[79] *See* https://www.redroofjobs.com/
[80] *Id.*

g.  Making or influencing hiring decisions;

h.  Providing onboarding and ongoing training; and

i.  Maintaining employment records, including training records.

137.    Despite having control over the training of staff at their branded properties, including the Bellflower Red Roof Inn, Red Roof failed to adequately train employees on how to recognize and respond to signs of human trafficking. Furthermore, Red Roof failed to implement policies or procedures that would address the ongoing issue of trafficking at their hotels, including monitoring reservation systems or payment methods that traffickers routinely exploited.

138.    Consequently, Red Roof knowingly received financial benefits through the ongoing venture with their branded properties, including the Bellflower Red Roof Inn, by sex traffickers. By renting rooms and providing additional services, such as Wi-Fi, to known traffickers, Red Roof profited from the continued exploitation of individuals, including Plaintiff, Plaintiff, while failing to adopt or enforce policies that could mitigate these risks.

139.    Red Roof knew or should have known that engaging in a venture with its branded properties, including Bellflower Red Roof Inn, was in violation of 18 U.S.C §1591(a):

j.  Red Roof entered into a venture to operate the Bellflower Red Roof Inn with the shared objective of maximizing revenue and profits;

k.  Red Roof knowingly received a financial benefit from this venture in the form of franchising fees, royalty fees, and other payments from Bellflower Red Roof Inn;

l.  Bellflower Red Roof Inn violated 18 U.S.C §1591(a)(1) because, through their management of the Red Roof Inn and the acts and omissions of the staff of this hotel, Bellflower Red Roof Inn harbored trafficking victims and participated in a venture with sex traffickers; and

41

m. Red Roof knew, or with the exercise of reasonable diligence, should have known that Bellflower Red Roof Inn were engaged in violations of 18 U.S.C §1591(a). Red Roof should have known about Bellflower Red Roof Inn's activity at the Red Roof Inn because Red Roof retained control over relevant aspects of the operations of the Red Roof Inn and thus owed a corresponding duty. Despite this, Red Roof continued to knowingly benefit from its relationship with Bellflower Red Roof Inn, including the proceeds Bellflower Red Roof Inn obtained from unlawful sex trafficking. Even after becoming aware of these violations, Red Roof continued providing Bellflower Red Roof Inn with operational support, use of its trademarks, and other resources to operate the Red Roof Inn in a way that Red Roof knew or should have known was engaging in violations of 18 U.S.C §1591(a).

140. The stringent control and standardization of operations across Red Roof properties, including mandatory use of specific reservation and payment systems, not only streamline corporate oversight but also optimize revenue streams. These systems, while ostensibly for operational efficiency, also inadvertently facilitated the booking processes used by traffickers, thereby increasing room occupancy rates and directly benefiting Red Roof financially.

141. Red Roof is vicariously liable for the acts and omissions of its agents, branded properties, and any sub-agents or employees of its branded properties with respect to the operation of the its branded properties, including Bellflower Red Roof Inn.

## CAUSES OF ACTION

### COUNT 1: 18 U.S.C. § 1595 ("TVPRA")
### (AGAINST ALL DEFENDANTS)

142. Plaintiff incorporates each foregoing allegation.

143. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a)

and is entitled to bring a civil action under 18 U.S.C. §1595.

144.    Red Roof in ways described above knowingly or recklessly participated in harboring, maintenance, and/or other acts in further of sex trafficking, including the sex trafficking of Plaintiff and Red Roofs knowingly benefitted, by receiving financial and other compensation, through their participation in a venture that they knew or were reckless in not knowing involved the trafficking, harboring, and maintenance of sex trafficking victims in exchange for financial benefits. 18 U.S.C. §§ 1590(a), 1591(a)(2), 1593A.

145.    Furthermore, Red Roofs' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Red Roof had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, engaged in violating the TVPRA. At all relevant times, Red Roof breached this duty by facilitating violations of the TVPRA through their participation in the harboring, maintaining, soliciting, and advertising of Plaintiff and her traffickers for the purposes of commercial sex induced by force, fraud, or coercion.

146.    Red Roof has continued to benefit as a result of these acts, omissions, and/or commissions by renting rooms and providing Wi-Fi to traffickers and customers, keeping operating costs low, maintaining the loyal customer base that fuels the supply and demand of sex trafficking, and limiting mandatory regulations. Moreover, on each occasion, they received payment for rooms or kickbacks from internet usage, contributing to their direct financial benefit from the sex trafficking of Plaintiff when they knew or should have known that violations of §1591(a) were occurring.

147.    Despite knowledge of Plaintiff's sex trafficking by Red Roof, Plaintiff's traffickers were able to continue renting rooms for the sexual exploitation of Plaintiff

148.     Red Roof as set forth in this Complaint participated in a venture together and with, among others, Plaintiff's traffickers. Red Roof had an ongoing business relationship and association in fact with Plaintiff's traffickers. Despite knowing or having reason to know that Plaintiff was being sex trafficked in violation of the TVPRA, Red Roof continued to rent rooms to her traffickers, providing a secure venue for Plaintiff's sexual exploitation. Plaintiff's sex traffickers used Red Roof's Hotels because they knew that staff members looked the other way despite obvious signs of trafficking. Each of the venturers shared a common purpose – the rental of hotel rooms and the making of profits. Red Roof profited while Plaintiff's traffickers were able to rent a secure venue to earn profits by trafficking Plaintiff Red Roof participated in the venture by continually renting rooms to Plaintiff's traffickers, failing to properly implement anti-trafficking rules and policies, and assisting traffickers to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of Plaintiff's trafficking.

149.     Red Roof's failure to train and supervise their agents and employees, as well as their disregard for the welfare of their guests, including Plaintiff, enabled and contributed to her sex trafficking.

150.     The facts alleged establish that Red Roof knowingly benefitted, financially or by receiving anything of value, from participating in a venture that Red Roof knew or should have known has engaged in an act in violation of the TVPRA.

151.     Plaintiff further alleges that, as a result of the relationship between Red Roof and their branded properties, Red Roof is vicariously liable for the acts of their branded properties, including at the Bellflower Red Roof Inn. Red Roof and their branded properties jointly controlled the terms and conditions of employment for staff, making them joint employers. Factors that

support this allegation include shared profits, standardized employee training, strict rules of operation, control over pricing and reservations, regular inspections, operational support, and Red Roof's right to terminate franchise agreements with their branded properties, including the Bellflower Red Roof Inn, for failing to comply with these requirements. Therefore, Red Roof retained control, or the right to control, the mode and manner of work contracted for, making them responsible for the acts and omissions of staff and branded properties.

152.    Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Red Roof's hotel and property. The actions, omissions, and/or commissions alleged in this pleading were the "but for'" and proximate cause of Plaintiff's injuries and damages, therefore Red Roof is jointly and severally liable.

## TOLLING OF LIMITATIONS

153.    To the extent Defendants assert an affirmative defense of limitations, Plaintiff invokes the discovery rule. At the time she was harmed and through at least 2015, Plaintiff was under the coercion and control of her traffickers who drugged her, threatened her, psychologically abused her, exercised coercive control over her, and severely restricted her freedom.  As a result, Plaintiff lacked the information and capacity to understand her injuries and their legal causes.

154.    Thus, Plaintiff did not discover and could not reasonably have discovered the legal cause of her injury more than ten years before she filed this lawsuit. While she was under the control of her traffickers, Plaintiff, through no fault of her own—lacked the information and understanding to bring a claim because she did not know both her injury and the cause of her injury. This lack of information was a direct result of Plaintiff being kept under the control, coercion, and manipulation of her traffickers, which Defendants facilitated.

155.    At the time Plaintiff was harmed, she did not know that she was the victim of human

trafficking as that term is defined by law, that her injury arose from being "trafficked" at Defendants' hotels or that she was a person "trafficked", much less that she was the "victim" of a legal venture involving defendants, and she did not discover and was not in a position to discover the legal cause of her injury, more than ten years before suit was filed.

156.    To the extent Defendants assert an affirmative defense of limitations, Plaintiff invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, Plaintiff faced extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than 10 years before

157.    Plaintiff filed this lawsuit.

158.

159.    While under the control of her traffickers through 2015, Plaintiff did not have the freedom to investigate her claims, to identify those responsible, or to seek legal representation necessary to pursue her legal rights. Plaintiff could not have pursued her claims while under the active control of her traffickers despite the exercise of ordinary diligence.

160.    To the extent Defendants assert an affirmative defense of limitations, Plaintiff invokes the continuing violation doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct by Defendants, individually and in concert, across the subject locations.

161.    Plaintiff was subject to continuous trafficking at the subject Red Roof Inn through at least 2015, which is not more than 10 years before Plaintiff this lawsuit.

162.    This continuous trafficking resulted from Defendants' facilitation of trafficking at the subject Red Roof Inn and Defendant's ongoing ventures with one another and with criminal traffickers at that hotel.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a.   Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b.   Disgorgement of profits obtained through unjust enrichment;

c.   Restitution;

d.   Statutory and/or treble damages, where available;

e.   Punitive damages;

f.   Attorneys' fees and expenses;

g.   The costs of this action;

h.   Pre- and post-judgment interest; and

i.   Any other relief the Court or jury deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by struck jury.

Dated: April 4, 2025

Respectfully submitted,

*/s/ Penny L. Barrick*
Penny L. Barrick (0074110)
Steven C. Babin, Jr. (0093584)
Babin Law, LLC
10 West Broad Street, Suite 900
Columbus, Ohio 43215
T: 614-761-8800
E: steven.babin@babinlaws.com /

penny.barrick@babinlaws.com